# EXHIBIT E

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STILLPATH RETREAT CENTER LLC,
a California limited liability
company,

      Plaintiff,

vs.                              Case No. 3:15-cv-01386-MMC

AMERICAN ADDICTION CENTERS, INC.,
a Nevada corporation,

      Plaintiff-Intervenor,
vs.

COUNTY OF SAN MATEO, a California
municipality,

      Defendant.

Pages 1 through 172, inclusive.


VIDEOTAPED DEPOSITION OF RAYMOND BLATT

VOLUME I, Pages 1 to 172

FRIDAY, DECEMBER 9, 2016

9:18 a.m.



Kerr & Wagstaffe, LLP

101 Mission Street, 18th Floor

San Francisco, California


REPORTED BY:

DEBBY CLARY, CSR No. 9705

REGISTERED MERIT REPORTER

1    technical opinions concerning the physical

2    characteristics of the facility or the availability of

3    infrastructure or anything like that?

4        A.  I remember them giving me general things like,

5    for instance, there's an office located down a hallway

6    that would be perfect for a, you know, kind of a, a,

7    your first phase so you have supervision immediately

8    there.

9            I remember that there were other things, but it

10   was generally that they, they thought it would be a

11   great place.

12       Q.  At this point in time, before seeking the

13   permit amendment from the county, did you have the site

14   inspected with respect to water usage and water

15   availability?

16       A.  No.

17       Q.  At any point in time, did you hire a

18   professional traffic engineer to conduct a traffic study

19   in connection with the proposed Stillpath operation?

20       A.  I don't know if J.R. did or not or my dad did

21   or not.

22       Q.  But you didn't?

23       A.  I didn't.  I, I don't recall.  I didn't hire

24   anybody.

25       Q.  All right.  Let me show you what we'll mark as

1    Exhibit 210.  It's an email, SP 0185 through 87.

2             (WHEREUPON, DEPOSITION EXHIBIT 210 WAS MARKED

3             FOR IDENTIFICATION.)

4             THE WITNESS:  Thank you.

5    BY MR. VON LOEWENFELDT:

6        Q.  I'm sure you recall this, but why don't you

7    take a minute to read through it; let me know when

8    you're done.

9        A.  (Witness complies.)

10            I'm finished.

11       Q.  Okay.  Great.

12            Do you recall sending the email and attached

13   letter reflected as Exhibit 210?

14       A.  I do.

15       Q.  Is this your first written correspondence with

16   the County of San Mateo concerning your proposed use of

17   the Stillheart property?

18       A.  I believe so.

19       Q.  All right.  Do you -- sitting here today, do

20   you have a present memory of your meeting with

21   Mr. Schaller that predates Exhibit 210?

22       A.  I do.

23       Q.  And how did you meet Mr. Schaller?

24       A.  I believe that the, a representative of

25   Stillheart had called in to the county with questions

1    about who to talk to and regarding our potential use of

2    the property.

3        Q.  Okay.

4        A.  And they said speak to Mike Schaller and so I,

5    I don't know if I made appointment or I just showed up.

6    I went to the, the, downtown San Mateo and I spoke to

7    him in person at the planning department.

8        Q.  Do you recall where you were when you spoke

9    with him?

10       A.  I believe I was at the, god, I don't know what

11   floor it is, but it's the counter at the, in the

12   building planning department.

13       Q.  Were you speaking across the counter?

14       A.  Yes.

15       Q.  Okay.  And how long did that conversation take?

16       A.  I think it was approximately an hour.

17       Q.  Did you bring any documents with you for that

18   conversation?

19       A.  I think I brought the existing use permit and

20   some site plans that were the marketing material of

21   Stillheart.

22       Q.  I'm sorry, did you say site plans and the

23   marketing material of Stillheart or --

24       A.  The site plans that were the marketing material

25   for, they have little 8-by-11 pieces of paper that show

```
 1    where the buildings are.

 2         Q.  Oh, like a map?

 3         A.  Like a map, yeah.

 4         Q.  I see.  Okay.

 5              Did you bring any proposed plans or rules for

 6    how the treatment facility would operate when you spoke

 7    with Mr. Schaller that first time?

 8         A.  No.

 9         Q.  Do you recall what you discussed with

10    Mr. Schaller during that hour?

11              MR. VIGNOLO:  Overbroad.

12              THE WITNESS:  I know that we spoke about the

13    general kind of idea and concept.  The specifics of it,

14    I don't know.  I think that we had decided that I would

15    email him more details.

16    BY MR. VON LOEWENFELDT:

17         Q.  Okay.  Do you know whether you discussed

18    staffing or, or patient load -- loads is the wrong word.

19    I'm thinking of airplanes -- patient populations with

20    Mr. Schaller during that first meeting?

21         A.  I think we talked in general terms about it,

22    but I don't know the specifics.  I mean, those would

23    have been the general things we talked about.

24         Q.  Do you recall anything that you said, that

25    Mr. Schaller said to you specifically during that
```

 1  meeting?

 2              MR. VIGNOLO:  Overbroad.

 3              THE WITNESS:  My recollection is that he

 4  thought it would be a, a good use of the property.

 5  BY MR. VON LOEWENFELDT:

 6       Q.  Okay.  And he asked you to send him some

 7  details?

 8       A.  Yes.

 9       Q.  At that first meeting, did you discuss with

10  Mr. Schaller -- with Mr. Schaller what would or would

11  not be required in terms of changes to the existing CUP?

12       A.  I asked him what, in his opinion, the, the

13  process would be and he said that, to put the things on,

14  on paper and he would look at it and speak to whoever he

15  needed to speak to and find out if it did, if it would

16  fit under the existing use permit or not, and then he

17  would be able to tell me what the process was.

18       Q.  Prior to that meeting, did you have any

19  expectation yourself about whether an amendment to the

20  use permit would be required?

21       A.  I had no expectation.

22       Q.  Had you consulted with any professionals prior

23  to that meeting concerning whether a use permit

24  amendment would be required?

25       A.  No, I prefer to go straight to the source.

    1        Q.  Sure.

    2            So there's a sentence that reads, "Also,

    3    instead of having 30 people checking in on Friday and

    4    out on Sunday in a small time window under the current

    5    business plan, our clients check in throughout the

    6    month."

    7            Do you see that?

    8        A.  I do.  I'm sorry, I apologize.  I see it now.

    9        Q.  No problem.

   10            What were you referring to when you said our

   11    current business plan, or "the current business plan"?

   12        A.  I was forecasting out how our, how standard

   13    businesses like this run.

   14        Q.  I see.

   15            And at this point, the business plan was in

   16    your head, not on paper; is that right?

   17        A.  That's correct.

   18        Q.  Then in the next paragraph you discuss first

   19    the number of staff that the Stillheart Institute has,

   20    it has six full-time and three part-time employees.

   21            Do you see that?

   22        A.  I do.

   23        Q.  Where did you get that information?

   24        A.  I got it from something from Stillheart

   25    Institute.  I don't know if it was from staff or

1    something they had in writing or something they had on

2    their conditional use permit, something.

3         Q.  Then you say, "Our current business model will

4    increase the current employees with an additional three

5    part-time staff members."

6              Do you see that?

7         A.  I do.

8         Q.  Does "our current business model" refer to

9    thoughts in your head at that point?

10        A.  Yes.

11        Q.  Okay.  Nothing on paper, correct?

12        A.  That's correct.

13        Q.  And, so was it your intention in April 2013 to

14   run this facility with six full-time and three and --

15   excuse me -- six part-time employees?

16        A.  To start off, yes.

17        Q.  And let's start with the full-time people.

18   What positions would those six people be in?

19        A.  Those would have been program directors,

20   clinical directors, resident techs, program assistants,

21   people of that nature.

22        Q.  One clinical director, right?

23        A.  Yes.

24        Q.  And how many of the six people would be program

25   directors?

```
 1        A.  I think this was taken from information done

 2   by, I believe, information I acquired from Mark Schwartz

 3   and Lori Galperin when they originally looked at this

 4   back in 2011.

 5        Q.  Hmm.

 6        A.  And I just added in some, like the property,

 7   the mortgage interest, things like that that applied to

 8   this deal that she had given and any updates I had, you

 9   know, utilities and things like that that were facility

10   costs.

11        Q.  Do you think that the updating work that you

12   did, did that occur between the time Ms. Gisonni asked

13   for the information and the next two weeks when you

14   provided it?

15        A.  It might have.  I don't know for sure.

16        Q.  Okay.

17            Let me show you what's been previously marked

18   as Exhibit 139.  Let me know when you've had a chance to

19   read that.

20        A.  Sorry, the, the writing's very small.

21        Q.  Yes, it is.

22        A.  Okay.  I finished.

23        Q.  Okay.  Great.

24            First, did you, did you receive this email from

25   Debbie Gisonni on or about July 12th, 2013?
```

1          A.   Appears that I did, yes.

2          Q.   All right.  And did you know at that time that

3     J.R. Rodine was having conversations with Debbie Gisonni

4     concerning the property?

5          A.   I was just made aware, I'm sure by this email.

6          Q.   All right.  When you hired Mr. Rodine, did you

7     expect that he was going to work exclusively for you in

8     connection with the property?

9               MR. VIGNOLO:  Lacks foundation, assumes facts.

10              THE WITNESS:  For, for my entity, Still,

11    Stillpath, yes.

12    BY MR. VON LOEWENFELDT:

13         Q.   Okay.  You weren't expecting him to also be

14    consulting with the seller on, on the seller's behalf,

15    were you?

16         A.   No, but I understood that they had a

17    relationship and this seller was the one who recommended

18    J.R. to us because of their previous -- he was in charge

19    of their previous entitlements.

20         Q.   Okay.  And J.R. Rodine says to Debbie Gisonni,

21    "I suspect we will need to refresh the CEQA initial

22    study to reflect the change in occupancy and use in

23    conjunction with the RM and CUP."

24              Do you see that?

25         A.   I do.

```
 1        Q.  Is that advice that Mr. Rodine also gave you at

 2   about that time?

 3        A.  I don't think he gave me that advice.

 4        Q.  Did he give you any contrary advice at that

 5   time?

 6        A.  All I remember is him telling me that we were

 7   not required to get a CEQA initial study by the staff.

 8        Q.  When you received this email from Debbie

 9   Gisonni, did you ask Mr. Rodine why he was telling her

10   that you were required to get a CEQA initial study?

11        A.  No.

12        Q.  Do you know when Mr. Rodine told you you were

13   not required to get a CEQA initial study?

14        A.  No.

15        Q.  Does it concern you that he may have been

16   giving different advice to Ms. Gisonni than to you?

17        A.  No.

18        Q.  Do you know what the RM is?

19        A.  Resource management, it's a zoning section of

20   the ordinance.

21        Q.  Okay.

22        A.  Designation of land.

23        Q.  Do you see at the end of that same paragraph,

24   he says, "I do not see this process as a slam dunk or

25   sure thing until getting into it with key players."
```

1              Do you see that?

2         A.  I do.

3         Q.  Did Mr. Rodine give you that advice?

4              MR. VIGNOLO:  Overbroad as to time.

5              THE WITNESS:  The only thing I recall is that

6    he didn't, like any good consultant, guarantee anything

7    until he had done his research.

8    BY MR. VON LOEWENFELDT:

9         Q.  Did he express skepticism to you about whether

10   your project will be approved?

11             MR. VIGNOLO:  Overbroad as to time, vague and

12   ambiguous.

13             THE WITNESS:  I think his advice changed over

14   the process with given events.

15   BY MR. VON LOEWENFELDT:

16        Q.  Okay.  At the beginning of the process, did he

17   express any skepticism as to whether your application

18   would be approved?

19        A.  I think the -- there wasn't much.  He felt

20   confident, but he was concerned about any political --

21   he wanted to make sure that we, or that he spoke to the

22   right people so that he understood politically, and the

23   neighbors, that they didn't take, you know, didn't

24   control the deal or control the, the use permit process.

25        Q.  Did Mr. Rodine advise you to engage in

```
 1        A.  I know that it was continued by the, by the

 2   commission.

 3        Q.  Do you recall whether the meeting, or the phone

 4   call, excuse me, with Lenny Roberts was between the

 5   first and second meeting or the second and third

 6   meeting?

 7        A.  I don't recall.

 8        Q.  Okay.

 9             MR. VON LOEWENFELDT:  Let me mark as

10   Exhibit 200 and --

11             THE REPORTER:  16.

12             MR. VON LOEWENFELDT:  -- 16, an application for

13   use permit form SP 752 through 756.

14             (WHEREUPON, DEPOSITION EXHIBIT 216 WAS MARKED

15             FOR IDENTIFICATION.)

16   BY MR. VON LOEWENFELDT:

17        Q.  Is Exhibit 216 the application that Stillpath

18   filed for amendment to the conditional use permit

19   covering the land where, that Stillheart owned?

20        A.  I don't know if this is the whole thing.  I, I

21   see the application form and a letter to Schaller, to

22   Mike Schaller, but, so I don't know if there were any

23   other attachments to this.

24        Q.  Do, do you have some reason to think there were

25   other attachments to this?
```

1        A.  No, it's just that this has been a long time so

2    I don't want to say this is everything, encompassing

3    everything, and then all of a sudden there's one more

4    document.

5        Q.  I understand.

6        A.  Yeah.

7        Q.  Okay.  So this is at least part of that

8    application, correct?

9        A.  Correct.

10       Q.  And do you know why your father signed this

11   instead of you?

12       A.  I think he was in town and I was in Bozeman.

13       Q.  Okay.  You were already in Bozeman as of

14   July 2013?

15       A.  Yes.

16       Q.  You weren't living there yet, though, correct?

17       A.  We had, we had a house there, but we hadn't

18   moved for, for that.  I was coming back, flying back

19   weekly to handle this and other, other California -- --

20       Q.  So in this --

21       A.  -- business dealings.

22       Q.  -- in, in this period of time in the summer of

23   2013, how much time were you spending in Northern

24   California as opposed to Montana?

25       A.  I was spending significant time in Northern

 1   whether it should be leased or operated by you.

 2        Did your move to Bozeman also influence your

 3   decision as to whether you wanted to try and operate

 4   this facility or lease it?

 5        A.  I don't know if it was the move to Bozeman, but

 6   my family being in Bozeman became the determining force

 7   for me.

 8        Q.  Thinking more about it, have you been able to

 9   pin down any further when you made the decision that you

10   were going to lease this property and not run it?

11        A.  It would have been in, for me, personally, when

12   we started entering into more serious negotiations with

13   the lessors, with American Addictions Centers.

14        Q.  And --

15        A.  So it would have been in my mind, those

16   discussions, you know, last three, four months of 2013.

17        Q.  Now, attached to Exhibit 216 is a two-page

18   letter.  This is the same letter you had earlier

19   submitted to the county; is that right?

20        A.  That's correct.

21        Q.  And the only difference is the date; is that

22   right?

23        A.  Just to make sure, you want to -- let's look at

24   the other one, just to --

25        Q.  Sure.

```
 1              The other one is Exhibit 210.
 2              MR. VIGNOLO:  And I'll object that the
 3    documents speak for themselves.
 4              THE WITNESS:  First it looks like the, the
 5    Sausalito Alta Mira LLC title changed to Stillpath
 6    Recovery Center.
 7    BY MR. VON LOEWENFELDT:
 8         Q.  Okay.
 9         A.  So during that time, we probably formed the LLC
10    that would be the assignee under the letter of intent.
11         Q.  Okay.
12         A.  Everything else looks identical.
13         Q.  All right.
14         A.  Except for the date, as you mentioned.
15         Q.  And on the first page of the application, do
16    you see there's a section that says, "If an amendment to
17    the existing permit, please describe the specific
18    proposed changes in the operation."
19              That's in the prewritten text right here
20    (indicating).
21         A.  Yes.
22         Q.  And then there's the handwriting "See
23    attached."
24              Do you see that?
25         A.  I do.
```

1          Q.  Is that intended to refer to the letter that

2    was attached?

3              MR. VIGNOLO:  Calls for speculation, lacks

4    foundation.

5              THE WITNESS:  It looks like it.

6    BY MR. VON LOEWENFELDT:

7          Q.  Okay.  And the letter, we discussed earlier the

8    letter and its six full-time and six part-time staff

9    members.

10             Had you done any further work developing a

11   staff plan between providing this letter to Mr. Schaller

12   in Exhibit 210 and submitting it as part of the

13   application for use permit in Exhibit 216?

14             MR. VIGNOLO:  Assumes facts, misstates

15   testimony.

16             THE WITNESS:  I think that the only other thing

17   I had done, and I think I probably did it with both, was

18   the, well, I didn't do any more specific staff planning,

19   I guess, if that's your question.

20   BY MR. VON LOEWENFELDT:

21         Q.  Okay.  Now, you submitted, or Stillpath

22   submitted this application at the end of July 2013,

23   correct?  It's dated July 29th.

24         A.  That is correct.

25         Q.  Okay.  And we had earlier looked at

```
 1   his blood sugar?

 2            BY MR. VON LOEWENFELDT:  Yeah, I, I think

 3   that's a good idea.

 4            THE VIDEOGRAPHER:  All right.  Microphones,

 5   please.  Microphones.

 6            Going off the record.  The time is 1:12.

 7            (Recess.)

 8            THE VIDEOGRAPHER:  We're back on the record.

 9   The time is 1:17.

10   BY MR. VON LOEWENFELDT:

11       Q.  So, Mr. Blatt, now back on, let me make sure.

12   You were testifying earlier about the SAMHSA guidelines.

13   What is your understanding of that ratio?

14       A.  I apologize, thank you for the break.  That it

15   is one staff person to every five to nine clients.

16       Q.  Okay.  And is that a clinical staff ratio or a

17   total staff ratio?

18       A.  Clinical.

19       Q.  So were you intending then in the application,

20   Exhibit 216, to represent to the County of San Mateo

21   that the proposed staffing for Stillpath would be six

22   full-time and six part-time staff members?

23       A.  I believe that that would be what would be at

24   startup and for a time, for a good time, good amount of

25   time --
```

 1        Q.  And --

 2        A.  -- to, for, for us to run it, depending, you

 3   know, things might change, but at that time, that's what

 4   I believed.

 5        Q.  Okay.  And had you given any more thought as of

 6   that time to what -- well, first off, how many of those

 7   people would be clinical staff?

 8             MR. VIGNOLO:  Lacks foundation.

 9             THE WITNESS:  Yeah.

10   BY MR. VON LOEWENFELDT:

11        Q.  Actually, I'm not asking you to guess.

12             Did you have a, did you have a specific

13   understanding at that time for how many of those people

14   would be clinical staff?

15        A.  No, I did not.

16        Q.  Okay.  Is it just not a subject you thought

17   about?

18        A.  Yeah, I didn't think about it.

19        Q.  Okay.

20             Right.  As I'm asking you about your

21   representations to the county earlier, what I'm not

22   asking you to do is rationalize them now.  I want to

23   know what you were thinking about at the time, if

24   anything.  And I understand some of my questions may not

25   be clear in that regard, but it's --

```
 1              MR. VIGNOLO:  Assumes facts.

 2              THE WITNESS:  No.

 3   BY MR. VON LOEWENFELDT:

 4        Q.  Why does it not surprise you?

 5        A.  I had no experience in San Mateo County.

 6        Q.  Okay.  Do you know what decision it is that

 7   Mr. Rodine is indicating you're going to get back to him

 8   on Monday about?

 9        A.  No.

10        Q.  Was there any decision being made about

11   meetings of some kind in late August 2013 where you had

12   a disagreement with Mr. Rodine?

13        A.  Not that I remember.

14        Q.  All right.  Let's mark as Exhibit 218 -- excuse

15   me -- I'm going to show you what's been previously

16   marked as Exhibit 140.

17             I note that the top "To" and "From" information

18   is between you and a lawyer, and I assume that's simply

19   you transmitting the email for production in the case

20   given the dates, so we'll ignore that portion.

21             Is that correct, Counsel?

22             MR. VIGNOLO:  That's correct.

23             MR. VON LOEWENFELDT:  Okay.  Thank you.

24        Q.  So focusing on the, the actual email, is this a

25   series of correspondence between you and J.R. Rodine
```

```
 1   discussing correspondence you received from Mike

 2   Schaller?

 3        A.  Yes.

 4        Q.  Okay.  And in your email to Mr. Schall- --

 5   Mr. Rodine, you forwarded on to Mr. Rodine Exhibit 12,

 6   which we discussed earlier; is that right?

 7        A.  I don't know.

 8            I don't see an attachment on this.

 9        Q.  No, I'm sorry, but you actually just forwarded.

10            If you look at the bottom of the email, that's

11   Exhibit 12, right?

12        A.  That is Exhibit 12, I'm sorry.

13        Q.  Okay.

14        A.  You're correct.

15        Q.  So you were sending that to Mr. Rodine and

16   discussing it?

17        A.  Yes.

18        Q.  And you state to Mr. Rodine, "His opinion was

19   based on his review of the letter I sent you yesterday."

20            Do you see that?

21        A.  Yes.

22        Q.  Was that letter Exhibit 210 which you had

23   provided earlier to Mr. Schaller?

24        A.  I believe so.

25        Q.  Okay.  So you agree that Mr. Schaller's email
```

1    to you, Exhibit 12, was based on his review of

2    Exhibit 210?

3            MR. VIGNOLO:  Calls for speculation, lacks

4    foundation.

5            THE WITNESS:  I'm sorry, repeat that one more

6    time.

7    BY MR. VON LOEWENFELDT:

8        Q.  Mr. Schaller's Exhibit 12 to you was based on

9    Mr. Schaller's review of Exhibit 210; is that right?

10           MR. VIGNOLO:  Same objections.

11           THE WITNESS:  Any discussions we would have had

12   around that time in our one-on-one meeting.

13   BY MR. VON LOEWENFELDT:

14       Q.  All right.  And then Mr. Rodine says to you,

15   "Let's be proactive but cautious as staff has a tendency

16   to trivialize such matters before they become issues."

17           Do you see that?

18       A.  I do.

19       Q.  Do you know what he was referring to?

20       A.  No.

21       Q.  Did you have any conversation with Mr. Rodine

22   concerning his opinion that staff has a tendency to

23   trivialize, trivialize such matters?

24       A.  No, I did not.

25       Q.  Okay.  Thank you.  I'm done with that one.

```
 1                    REPORTER'S CERTIFICATE

 2           I, DEBBY CLARY, a Certified Shorthand Reporter

 3   and Registered Merit Reporter, do hereby certify:

 4           That the foregoing proceedings were taken

 5   before me at the time and place therein set forth, at

 6   which time both witnesses were put under oath by me;

 7           That the testimony of both witnesses, the

 8   questions propounded, and all objections and statements

 9   made at the time of the examination were recorded

10   stenographically by me and were thereafter transcribed;

11           That a review of the transcript by both

12   deponents was requested;

13           That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15           I further certify that I am not a relative or

16   employee of any attorney of the parties, nor financially

17   interested in the action.

18           I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21

22   Dated:  December 15, 2016

23                            _____

24                            DEBBY CLARY, CSR 9705
                              Registered Merit Reporter

25
```